Filed 11/26/13

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WHITE MOUNTAINS REINSURANCE COMPANY OF AMERICA,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>BORTON PETRINI, LLP,<br><br>     Defendant and Respondent. | C071365<br><br>(Super. Ct. No. 34201000069376CUPNGDS) |

     APPEAL from a judgment of the Superior Court of Sacramento County, Gerrit W. Wood, Judge.  Reversed.

     Selvin Wraith Halman, Gary R. Selvin and Nancy J. Strout for Plaintiff and Appellant.

     Roeca Haas Hager, Russell S. Roeca, Shannon L. Ernster, and Kyle Montes De Oca for Defendant and Respondent.

1

There is a general rule in California barring the assignment of a cause of action for legal malpractice. In this case, we recognize a narrow exception to that rule. Specifically, a cause of action for legal malpractice *is* transferable when (as here): (1) the assignment of the legal malpractice claim is only a small, incidental part of a larger commercial transfer between insurance companies; (2) the larger transfer is of assets, rights, obligations, and liabilities and does not treat the legal malpractice claim as a distinct commodity; (3) the transfer is not to a former adversary; (4) the legal malpractice claim arose under circumstances where the original client insurance company retained the attorney to represent and defend an insured; and (5) the communications between the attorney and the original client insurance company were conducted via a third party claims administrator. Under the circumstances set forth above, the public policy concerns that have been determined in other cases to weigh against the assignment of legal malpractice claims do not arise. Thus, the trial court erred in deciding that plaintiff White Mountains Reinsurance Company of America (White Mountains) lacked standing to prosecute this legal malpractice action against defendant Borton Petrini LLP (Borton) because White Mountains acquired the cause of action through assignment from the original insurer. We will, therefore, reverse the judgment in favor of Borton.

FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are taken from a "Joint Stipulation of Facts" the parties entered into for purposes of resolving a joint "Motion on Agreed Dispositive Issue."

Modern Service Insurance Company (Modern Service) issued a car insurance policy to Flora Cuison covering the period from January 2003 to January 2004, with a $100,000 limit on bodily injury liability per person. In July 2003, Cuison caused an automobile accident that seriously injured Karen Johnson. In June 2005, Johnson filed suit against Cuison. Cuison was purportedly served with the complaint in the action, along with an undated 30-day offer to compromise for the $100,000 policy limits, around June 29.

2

On or about July 11, Country Insurance & Fidelity Services (Country), the claims administrator acting on behalf of Modern Service, faxed a letter to Borton Petrini asking the firm to accept the defense of Cuison in the action. Borton took the case, representing Modern Service and Cuison, and allowed the offer to compromise to expire without a response.

In 2005 and 2006, Borton reported on the progress of the case, submitted invoices to, and received payments from Modern Service for services rendered.

In October 2006, Mutual Service Casualty Insurance Company (Mutual Service) and FolksAmerica Reinsurance Company (FolksAmerica) entered into a stock repurchase agreement under which Mutual Service would be demutualized and FolksAmerica would acquire Mutual Service's stock.

In December 2006, while the stock repurchase agreement had not yet been completed, Modern Service entered into an assumption reinsurance and administration agreement with Mutual Service under which Mutual Service assumed the California liabilities of Modern Service. Specifically, under that agreement Modern Service ceded to Mutual Service all of its " 'gross direct obligations and liabilities and rights under and relating to' " " 'all insurance business written by [Modern Service] since its incorporation in respect of risks located in California.' " (Modern Service was ceasing to conduct business in California.) The Cuison policy was one of the polices Mutual Service assumed in the deal.

A few days after the Modern Service/Mutual Service deal, the stock transaction between Mutual Service and FolksAmerica closed, and Mutual Service changed its name to Stockbridge Insurance Company (Stockbridge).

In 2007, Borton continued to report on the progress of the case and continued to submit invoices to Modern Service in care of Country, but the payments Borton received in January and February were from Mutual Service. Between June and September, the payments were from Stockbridge.

3

In September 2007, Stockbridge transferred its liabilities to FolksAmerica. Thereafter, although Borton continued to report on the case and submit invoices to Modern Service care of Country (which it did throughout its participation in the case), the payments came from FolksAmerica.

In July 2008, FolksAmerica changed its name to White Mountains. Nonetheless, Borton continued to receive payments on the case in the name of FolksAmerica. It was not until May 2009 that the name of White Mountains began appearing on the payments. Two months earlier, however, a different law firm had been substituted in place of Borton. (Thus, White Mountains paid Borton's final invoices following the substitution of counsel.)

In November 2009, White Mountains paid $1.86 million to settle the case.

In January 2010, White Mountains, denominating itself the successor-in-interest to Modern Service, commenced this action against Borton by filing a complaint for negligence alleging that Borton had committed malpractice by letting the offer to compromise expire, thereby exposing the insurer to liability in excess of the $100,000 policy limits and causing the insurer to incur substantial expenses for attorneys and experts to defend Cuison against Johnson's lawsuit.

In 2011, Borton moved for summary judgment on the ground that a legal malpractice cause of action may not be assigned and therefore White Mountains lacked standing to pursue the action. In January 2012, the trial court denied the motion on the ground that Borton had failed to show when the cause of action accrued and therefore failed to show that White Mountains had acquired the cause of action by assignment.

Thereafter, the parties agreed to have the trial judge resolve the question of White Mountains' standing based on the stipulated set of facts set out above. The trial court decided that the legal malpractice cause of action accrued when Modern Service incurred legal expenses it would not have incurred if the case had been settled for the policy limits in July 2005. Thus, White Mountains could have acquired the cause of action only by

4

assignment. The court further concluded, however, that a legal malpractice cause of action may not lawfully be assigned in California, even under the facts presented in this case. Accordingly, the court determined that White Mountains lacked standing to prosecute the action, and the court entered judgment against White Mountains in April 2012. Thereafter, White Mountains filed a timely notice of appeal.

DISCUSSION

White Mountains contends the trial court erred in "mechanically appl[ying] the rule prohibiting the sale and assignment of a single legal malpractice claim to conclude [Modern Service] improperly assigned the malpractice claim, in the context of sale of corporate assets, to White Mountains in contravention of California law." As we will explain, we agree the trial court erred. Under the facts of this case, the recognized public policy reasons for barring the assignment of a cause of action for legal malpractice do not apply.

I

*Goodley*

In California, the rule that a legal malpractice cause of action is not assignable can be traced to *Goodley v. Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389 (*Goodley)*, which has been referred to as "the seminal decision" on the assignability of legal malpractice claims. (Mallen & Smith, Legal Malpractice (2013) § 7:12, p. 835.) In *Goodley*, it was alleged that the defendant attorneys had negligently represented one Eleanor Katz in the proceeding to dissolve her marriage because they had returned to her certain original insurance policies of which she was the beneficiary and had failed to secure a court order to restrain her husband from changing the status of those policies. (*Goodley*, at p. 391.) It was further alleged that "during the pendency of the dissolution proceeding, her husband found the policies and, without her knowledge, cancelled the[m] and shortly thereafter died" and that as a result Katz was damaged in the sum of $147,000. (*Id.* at pp. 391-392.) The plaintiff, Goodley, further asserted that he was the owner of Katz's legal

5

malpractice claim against the attorneys by virtue of a written assignment from her. (*Ibid.*)

On summary judgment, the trial court concluded the action was without merit because " 'the cause of action is predicated on a tort (i.e., malpractice) and plaintiff is the assignee of the person who allegedly was the victim of malpractice, and causes of action for tort cannot be assigned.' " (*Goodley*, *supra*, 62 Cal.App.3d at p. 392, fn. 1.) The appellate court affirmed, albeit for a different reason. (*Id.* at pp. 395-398.)

The appellate court began by explaining as follows:

"In 1872 our Legislature effected a change in the common law rule of nonassignability of choses in action by enacting sections 953 and 954, Civil Code. Thus a thing in action arising out of either the violation of a right of property or an obligation or contract may be transferred [citations]. The construction and application of the broad rule of assignability have developed a complex pattern of case law underlying which is the basic public policy that ' "[a]ssignability of things in action is now the rule; nonassignability the exception" ' [citations]. ' "[A]nd this exception is confined to wrongs done to the person, the reputation, of the feelings of the injured party, and to contracts of a purely personal nature, like promises of marriage." ' [Citation.] Thus, causes of action for personal injuries arising out of a tort are not assignable nor are those founded upon wrongs of a purely personal nature such as to the reputation or the feelings of the one injured. Assignable are choses in action arising out of an obligation or breach of contract as are those arising out of the violation of a right of property [citation] or a wrong involving injury to personal or real property." (*Goodley*, *supra*, 62 Cal.App.3d at pp. 393-394, fns. omitted.)

Recognizing that "the personal nature of the duty owed to the client does not perforce convert the breach thereof to a 'tort of a purely personal nature' on a par with those wrongs done to the person of the injured party or his reputation or feelings which fall within the exception to the general rule of assignability" (*Goodley*, *supra*, 62

6

Cal.App.3d at p. 397), the appellate court nonetheless concluded that "a chose in action for legal malpractice is not assignable [because of] the uniquely personal nature of legal services and the contract out of which a highly personal and confidential attorney-client relationship arises, and public policy considerations based thereon." (*Id.* at p. 395.) The court explained that "[i]t is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." (*Id.* at p. 397.)

The appellate court continued as follows:

"Public policy encourages those who believe they have claims to solve their problems in a court of law and secure a judicial adjustment of their differences. The California Supreme Court has emphatically rejected the concept of self help [citation].

7

However, the ever present threat of assignment and the possibility that ultimately the attorney may be confronted with the necessity of defending himself against the assignee of an irresponsible client who, because of dissatisfaction with legal services rendered and out of resentment and/or for monetary gain, has discounted a purported claim for malpractice by assigning the same, would most surely result in a selective process for carefully choosing clients thereby rendering a disservice to the public and the profession." (*Goodley*, *supra*, 62 Cal.App.3d at pp. 397-398.)

The *Goodley* court also drew an analogy to the California Supreme Court's "early refusal to recognize a naked right of action for fraud and deceit as a marketable commodity, holding that assignment of a bare right to complain of fraud is contrary to public policy." (*Goodley*, *supra*, 62 Cal.App.3d at p. 398, fn. omitted.) In doing so, however, the court noted in a footnote that "[w]here the form of assignment to [the] plaintiff is sufficient to cover the property rights and claims of his assignors in and to the moneys or property so obtained by fraud and deceit, it constitutes a transfer of more than a mere naked right of action for fraud and deceit, since it includes also the right to recover the moneys or property so obtained." (*Id.* at p. 398, fn. 12.) Thus, as will become important hereafter, the *Goodley* court recognized that a person *may* assign a cause of action for fraud *along with* the person's right to the property obtained by the fraud, but a mere *naked* right of action for fraud, divorced from any other property right, is not assignable.

## II

### *California Cases After Goodley*

Since *Goodley* was decided in 1976, California courts have consistently adhered to the *Goodley* court's conclusion that a cause of action for legal malpractice is not assignable for public policy reasons. A survey of these post-*Goodley* cases will be helpful in determining whether the *Goodley* rule should apply under the facts presented here.

8

## A

### *Jackson*

In *Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, the appellate court concluded that "the public policies prohibiting assignment of legal malpractice causes of action" applied notwithstanding the plaintiff's characterization of "his assigned claims as sounding in fraud and intentional breach of contract." (*Id.* at p. 338.)  In that case, the plaintiff (Jackson) originally sued an attorney (Mix) and others for legal malpractice and securities fraud.  (*Id.* at pp. 338-339.)  Mix's malpractice insurance carriers retained a law firm (Rogers & Wells) and one of its partners (Lathrop) to defend the action.  (*Id.* at p. 339.)  After Mix rejected several settlement offers on advice of counsel, Jackson secured a judgment for more than a $1 million.  (*Ibid.*)  Jackson then turned around and sued the insurers, along with Rogers & Wells and Lathrop, for bad faith refusal to settle.  (*Ibid.*)  The insurers settled with Jackson and as part of that settlement assigned to Jackson their claims against Rogers & Wells and Lathrop, which Jackson asserted in an amended complaint.  (*Ibid.*)

On appeal from a judgment of dismissal following the sustaining of a demurrer to the assigned claims without leave to amend, the appellate court noted with respect to the claim of fraud that if the court "were to uphold a characterization of [the claim] as grounded in fraud rather than in classic attorney malpractice or negligence and thus assignable, [the court] would be requiring a trial court to second-guess the attorney's professional evaluations communicated to the client and the strategic choices made in the past in a confidential relationship in which the current plaintiff had no part, and was in fact adversary to the attorney-client partnership.  Such an attenuated theory of liability would lead to proof problems and would work mischief in the already busy field of legal malpractice litigation." (*Jackson v. Rogers & Wells*, *supra*, 210 Cal.App.3d at pp. 340, 346.)  With respect to "the allegation unnecessary services were rendered and the client charged for the same," the court held that "only the carrier-clients would have the right to

9

raise such a claim, since disputed billings which arose from an ongoing attorney-client relationship are not sufficiently analogous to a specific, identifiable piece of property . . . necessary . . . to support the assignability of a cause of action for fraud." (*Id.* at p. 347.)

The court also pointed out various public policy considerations that it believed "point[ed] toward the disallowance of assignment of the causes of action pleaded" "[u]nder the peculiar facts of th[e] case." (*Jackson v. Rogers & Wells*, *supra*, 210 Cal.App.3d at p. 348.) "Among these [we]re the need to preserve the element of trust between attorney and client, which could be impaired if the attorney perceives a future threat of the client's assignment to a stranger or adversary of a legal malpractice claim. Similarly, counsel might be discouraged from pursuing vigorous advocacy on behalf of his or her client if that advocacy might alienate the adversary, who might someday be motivated to sue the attorney for legal malpractice under an assignment of rights. An attorney might also seek to please an employer-insurer at the expense of the insured's best interest, if the attorney fears the employer might someday turn over its malpractice cause of action to a third party. Finally, if malpractice claims could be bought and sold, the inevitable result would be raised malpractice insurance premiums." (*Id.* at pp. 347-348.) The court concluded that these public policy considerations applied to both the cause of action for fraud and the cause of action for breach of contract. (*Id.* at p. 349.)

B

*Kracht*

In *Kracht v. Perrin, Gartland & Doyle* (1990) 219 Cal.App.3d 1019, the plaintiff (Kracht) originally sued a Charles Hogue and in the course of that suit served him with discovery requests. (*Id.* at p. 1021.) After judgment was entered in favor of Kracht because of the inadequacy of Hogue's responses to those requests, Kracht "sought and obtained a court order, pursuant to Code of Civil Procedure sections 708.510 and 708.520, compelling Hogue to assign all choses in action which he held against" the attorneys in Oregon who had assisted him with the deficient discovery responses. (*Ibid.*)

10

Kracht thereafter filed suit against the attorneys. (*Id.* at pp. 1021-1022.) The trial court sustained a demurrer without leave to amend, "concluding that the gravamen of all the claims was legal malpractice, that California law applied to the question of whether the claims were assignable, and that legal malpractice claims are not assignable under California law." (*Id.* at p. 1022.)

Relying on *Goodley* and *Jackson*, the appellate court began its opinion on Kracht's appeal by asserting that it was "now well settled that under California law a former client may not voluntarily assign his claims for legal malpractice against his former attorneys." (*Kracht v. Perrin, Gartland & Doyle*, *supra*, 219 Cal.App.3d at p. 1023, fn. omitted.) After examining the public policy concerns discussed in both of those cases, the court concluded that those concerns "are violated by *any* assignment of claims, whether voluntary or (as here) involuntary." (*Id.* at p. 1024.) The court then identified "[a]dditional reasons against assignability" where the assignment is an "*involuntary* transfer to the former adversary. First, a suit could be filed, even though the former client (to whom the duty was owed) was entirely satisfied with the services and opposed the filing of a malpractice lawsuit. Second, a suit brought on a claim acquired by involuntary assignment, and against the client's wishes, places the attorney in an untenable position. He must preserve the attorney-client privilege (the client having done nothing to waive the privilege) while trying to show that his representation of the client was not negligent. Finally, a malpractice suit filed by the former adversary is 'fraught with illogic' [citation] and unseemly arguments: In the former lawsuit Kracht judicially averred and proved she *was* entitled to recover against Hogue; but in the malpractice lawsuit Kracht must judicially aver that, but for attorney's negligence, she *was not entitled* to have recovered against Hogue. Reduced to its essence, Kracht's argument in the malpractice action is 'To the extent I was not entitled to recover, I am now entitled to recover.' " (*Id.* at pp. 1024-1025, fn. omitted.) The court concluded that "[b]ecause of the uniquely personal nature of the attorney-client relationship, and the numerous public policies which would

11

be violated if involuntary assignments of malpractice claims were allowed, we agree with *Goodley* and *Jackson* that California law precludes such assignments." (*Kracht*, at p. 1025.)

## C

### *Fireman's Fund*

In *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg* (1994) 30 Cal.App.4th 1373, several insurers (Insurers) "paid more than $10 million to settle a lawsuit against their developer insureds by homeowners alleging misrepresentations in the sales of residential units. The insureds then filed a legal malpractice case against their attorneys (Law Firm) for causing those misrepresentations to be made. Later, Insurers joined the malpractice lawsuit as plaintiffs under a theory of subrogation. Law Firm successfully demurred on the ground California law prohibiting assignment of legal malpractice actions also precluded Insurers from proceeding as subrogees to their insureds' claim against Law Firm. The court entered judgment dismissing Insurers as plaintiffs." (*Id.* at p. 1376.)

On appeal, "Insurers contend[ed] the public policies articulated . . . to restrict the assignability of legal malpractice claims are not applicable to a subrogation claim by a liability insurer who paid a claim against its insured client resulting from the insured's attorney's negligence. Insurers [sought] to distinguish [cases such as *Goodley* and *Kracht*] factually as not involving a subrogee insurer whose interests were directly affected by its subrogor's attorney's malpractice and whose interests were 'aligned' or 'virtually identical' with (and indeed 'derivative' of) the insured's interests against the attorney. Characterizing the superior court's ruling as inequitable in light of other public policies favoring reasonable settlements, encouraging liability carriers to meet their insureds' reasonable expectations, transferring risks to actual tortfeasors, and spreading loss among cotortfeasors, Insurers assert[ed] those public policies require[d] that their

12

lawsuit as subrogees be permitted." (*Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra*, 30 Cal.App.4th at p. 1380, fn. omitted.)

The appellate court rejected these arguments because it found it could not "depart from settled law" -- namely, the California Supreme Court's decision in *Fifield Manor v. Finston* (1960) 54 Cal.2d 632 "that absent express statutory authorization nonassignable claims are not subject to subrogation." (*Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra*, 30 Cal.App.4th at p. 1383.)  "No statute expressly authorizes subrogation of legal malpractice claims.  Hence, as legal malpractice claims are nonassignable, such claims may not be subrogated.  Thus, case law compels a holding Insureds' legal malpractice cause of action is not assignable to Insurers." (*Id.* at p. 1384.)

D

*Baum*

In *Baum v. Duckor, Spradling & Metzger* (1999) 72 Cal.App.4th 54, a law firm and an attorney (collectively, the attorneys) represented two corporations in connection with their financial restructure and bankruptcy proceedings.  (*Id.* at p. 58.)  According to the complaint in *Baum*, the attorneys breached their fiduciary duties to the corporations and committed legal malpractice by handling several transactions, the result of which was the fraudulent transfer of at least $2 million of the corporations' assets to the corporations' principal, to the detriment of the corporations' creditors.  (*Ibid.*)  Baum, who was the trustee of one of those creditors (the Baum Trust), claimed that he became the assignee of the corporations' claims against the attorneys, which were assets of the corporations' bankruptcy estates, "under an agreement with the bankruptcy trustees that was approved by order of the bankruptcy court." (*Id.* at pp. 58-59.)

On appeal from a dismissal following the sustaining of a demurrer without leave to amend, the appellate court concluded that "the bankruptcy trustees' purported assignment to Baum Trust of the debtor corporations' legal malpractice and breach of fiduciary duty claims was invalid as a matter of California law and public policy."

13

(*Baum v. Duckor, Spradling & Metzger*, *supra*, 72 Cal.App.4th at p. 63.) More specifically, the court expressed its view that "the holding . . . in *Kracht*, that the *Goodley* rule prohibiting assignment of legal malpractice claims applies to any assignment of such a claim, whether voluntary or involuntary [citation], should be extended for sound public policy reasons to cases (such as the instant case) in which a legal malpractice chose in action belonging to a bankrupt corporation involuntarily becomes an asset of the bankruptcy estate, and is then purportedly assigned by the bankruptcy trustee to a creditor of the debtor corporation." (*Baum*, at pp. 67-68.) The court explained that "[m]any of the public policy concerns discussed in *Goodley*, *Jackson* and *Kracht* are also of concern in the context of a bankruptcy trustee's purported assignment to creditors of a debtor corporation's potential legal malpractice claims against its former counsel. The attorney-client relationship is unique and involves a highly confidential relationship even where the client is a corporation. An attorney owes all clients, including a corporate client, duties of undivided loyalty and diligence, among other fiduciary duties. A bankruptcy trustee's purported assignment to creditors of a debtor's legal malpractice chose in action, especially under circumstances in which the bankruptcy trustee has decided not to prosecute such a claim, could encourage unjustified lawsuits and the commercialization of claims condemned in *Goodley* . . . . Even where, as alleged here, the bankruptcy court would have an 'oversight' role during a creditor assignee's prosecution of the legal malpractice claim against the debtor's former counsel, the assignment and prosecution of the claim would force attorneys to defend themselves against persons to whom no fiduciary duty of [*sic*] duty of care was owed. [Citation.] Such assignments would generate malpractice lawsuits, burdening the profession and the court system." (*Baum*, at p. 69.)

The decision in *Baum* was subsequently followed under substantially similar circumstances in *Curtis v. Kellogg & Andelson* (1999) 73 Cal.App.4th 492, 505-506.

14

### III

*Out-Of-State Cases*

As the foregoing cases demonstrate, in California the rule against the assignment of legal malpractice claims has never been applied (at least in a published appellate opinion) to a factual scenario like that present here.  In other states, however, courts have determined that the rule *should not apply* where the assignment of a cause of action for legal malpractice is incidental to a larger commercial transaction involving the transfer of other business assets and liabilities, because the public policy concerns that weigh against the assignment of legal malpractice claims do not arise in that context.  We turn to those cases.

### A

*Richter*

In *Richter v. Analex Corp.* (D.D.C. 1996) 940 F.Supp. 353, the plaintiff (Richter) had served as the attorney for a corporation known as Analex D.C. during a time in which the corporation paid large bonuses to, and negotiated consulting agreements with, two of its former officers.  (*Id.* at p. 355.)  After passing the costs of the bonuses and consulting agreements through to NASA, with which the corporation had an aerospace contract, Analex D.C. ended up incurring both criminal and civil liabilities.  (*Ibid.*)

In 1990, defendant Analex Corporation purchased certain assets from Analex D.C. and assumed financial responsibility for some of the fines imposed on Analex D.C.  (*Richter v. Analex Corp.*, *supra*, 940 F.Supp. at pp. 355-356.)  Subsequently, Richter sued Analex Corporation for breach of contract and other causes of action, and Analex Corporation counterclaimed for legal malpractice.  (*Id.* at p. 356.)  On Richter's motion to dismiss the counterclaim, Analex Corporation argued that it could assert the malpractice claim as Analex D.C.'s assignee because it had acquired the claim along with Analex D.C.'s liabilities with respect to the bonuses and consulting agreements.  (*Ibid.*)

15

The district court recognized that whether a legal malpractice claim was assignable under District of Columbia law was an issue of first impression. (*Richter v. Analex Corp.*, *supra*, 940 F.Supp. at p. 357.) In deciding that Analex D.C.'s malpractice claim *was* assignable, the court wrote as follows:

"The courts that have barred the assignment of legal malpractice claims have relied primarily on factors not present in this case, including the fear that parties will sell off claims, particularly to opponents or completely unrelated third parties, and a concern about jeopardizing the personal nature of legal services. [Citations.]

"[¶] . . . [¶]

"In this case, plaintiff was the attorney for the predecessor corporation whose liabilities now burden defendant. The legal malpractice claim was not bartered or sold to an unrelated third party; indeed, Analex [Corporation] argues that its liabilities, assumed from [Analex D.C.], arose directly out of plaintiff's conduct. Moreover, the interests involved are purely pecuniary in nature and do not implicate the kinds of concerns raised by the sale or assignment of a personal injury claim. As the Supreme Court of Maine persuasively put it, there is no reason to prohibit the assignment of a legal malpractice claim in a situation such as this. We are not here confronted with the establishment of a general market for such claims; this assignee has an intimate connection with the underlying lawsuit. . . . A legal malpractice claim is not for personal injury, but for economic harm. The argument that legal services are personal and involve confidential attorney-client relationships does not justify preventing a client like [this one] from realizing the value of its malpractice claim in what may be the most efficient way possible, namely, its assignment to someone else with a clear interest in the claim who also has the time, energy and resources to bring the suit. [Citation.]

"This Court concludes that in circumstances such as these, public policy does not prohibit the assignment of a legal malpractice claim and District of Columbia law does not prevent it." (*Richter v. Analex Corp.*, *supra*, 940 F.Supp. at pp. 357-358.)

16

B

*Cerberus*

In *Cerberus Partners, L.P. v. Gadsby & Hannah* (R.I. 1999) 728 A.2d 1057, on review from the granting of a motion for summary judgment, the Rhode Island Supreme Court was "called upon to determine the validity of the voluntary assignment of a legal malpractice claim as part of a commercial transaction." (*Id.* at p. 1057.) The plaintiffs in the case were financial institutions that had purchased $134 million in loans given by a group of lenders to SLM International, Inc. (SLM) (along with all of the rights and obligations connected with those loans). (*Ibid.*) The defendants were lawyers who had represented the lenders in the loan transactions. (*Ibid.*) In suing for malpractice, the plaintiffs claimed that the defendants had failed to perfect the lenders' security interest in SLM's assets, making it so that the plaintiffs were unable to collect the full value of the loans after SLM filed for reorganization in bankruptcy. (*Id.* at pp. 1057-1058.)

Acknowledging that "the assignment of legal malpractice claims as an integral part of a larger commercial transaction [wa]s an issue of first impression in Rhode Island," the court concluded "that on the specific factual circumstances present in this case, where an assignee of a commercial loan agreement brings a legal malpractice action against the attorney who represented the original lender in the commercial loan transaction, the assignment of that negligence claim, if arising from the assigned commercial loan agreement, is not prohibited by Rhode Island law." (*Cerberus Partners, L.P. v. Gadsby & Hannah*, *supra*, 728 A.2d at p. 1059.) The court explained the basis for its conclusion as follows:

"The legal malpractice claim asserted by the plaintiffs here arose out of a larger earlier commercial loan transaction. The plaintiffs did not merely purchase the legal malpractice claim, but were instead the assignees of the Lenders' original agreements with respect to the loans to SLM, and the plaintiffs acquired, along with those loans, all of the attendant obligations and rights that went along with those loans, including but not

17

limited to the Lenders' legal malpractice action against the defendants. Thus, we are not dealing here with a situation where a legal malpractice claim was transferred to a person without any other rights or obligations being transferred along with it. That was the factual situation present in the great majority of the cases cited to us from other jurisdictions that have considered the issue of the assignability of legal malpractice claims and it was upon those particular facts that the case holdings of non-assignability appear to have been predicated. [Citation.]

"[¶] . . . [¶]

"We are cognizant of the various and plausible, but in the main, public policy reasons related in those case holdings from those jurisdictions in which assignment of legal malpractice claims have been prohibited. We are not persuaded, however, that any public policy in this jurisdiction mandates blind adherence to a general rule of prohibition in all cases of assignment. We acknowledge the distinction between market assignments involving purely economic transactions, such as involved in the case before us, and freestanding malpractice personal injury claim assignments that necessarily involve and invoke the unique lawyer-client relationship and duty of confidentiality; privity, and the duty of the lawyer that runs only to the client; the creation of possible commercial markets for such claims; and the demeaning of the legal profession along with the prospect of having attorneys defend themselves against strangers and the possibility of being forced to divulge confidential lawyer-client information in defending against assigned claims. We believe, however, that an assignment, such as the sort that is involved in this particular case, serves as a waiver of the client's attorney-client privilege." (*Cerberus Partners, L.P. v. Gadsby & Hannah*, *supra*, 728 A.2d at pp. 1059-1060.)

Using *Richter* as its prime example, the Rhode Island Supreme Court explained that it was "persuaded of the soundness of the reasoning employed by those courts in jurisdictions that have distinguished between the voluntary assignment of a bare legal

18

claim for malpractice and the assignment of a claim for malpractice that is part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations." (*Cerberus Partners, L.P. v. Gadsby & Hannah*, *supra*, 728 A.2d at p. 1060.)

## C

### *Learning Curve*

In *Learning Curve Int'l, Inc. v. Seyfarth Shaw LLP* (Ill. App. 2009) 911 N.E.2d 1073, the defendant law firm represented a corporation (Learning Curve) in the defense of a complaint for trade secret misappropriation by another corporation (PlayWood). (*Id.* at p. 1076.) After the law firm allegedly advised Learning Curve to try the case rather than settle it for $350,000, PlayWood obtained a verdict that would cost Learning Curve about $6 million (not including exemplary damages), but the trial court granted judgment notwithstanding the verdict, and PlayWood appealed. (*Id.* at pp. 1076, 1078.) While the appeal was pending, Learning Curve merged with a third corporation (RC2) in a deal that made Learning Curve a wholly owned subsidiary of RC2. (*Id.* at pp. 1076-1077.) In the merger agreement, the shareholders of Learning Curve agreed to hold RC2 harmless from any liability arising from the litigation with PlayWood. (*Id.* at p. 1077.) Following the completion of the merger, an appellate court reinstated the jury verdict, and RC2 agreed to settle with PlayWood for more than $11 million. (*Ibid.*) Thereafter, the former shareholders of Learning Curve suggested suing the law firm for malpractice. (*Ibid.*) In anticipation of that suit, Learning Curve, RC2, and Learning Curve's former shareholders modified an escrow agreement that was part of the merger and gave the former shareholders the right to assume control of the malpractice suit if Learning Curve and RC2 were not pursuing it to their satisfaction and also gave the former shareholders the right to 90 percent of the proceeds from the suit. (*Id.* at pp. 1077-1078.)

On summary judgment, the trial court concluded (among other things) that Learning Curve had assigned its malpractice claim to its former shareholders in violation

19

of Illinois law. (*Learning Curve Int'l, Inc. v. Seyfarth Shaw LLP*, *supra*, 911 N.E.2d at pp. 1078-1079.) The appellate court agreed "that Learning Curve ha[d] assigned part of its claim to its former shareholders," (*id.* at p. 1079) but disagreed that the assignment violated Illinois law (*id.* at pp. 1081-1082). The appellate court explained that while "Illinois law generally forbids the assignment of claims for legal malpractice," "[t]he rule in Illinois, as in other states, permits the transfer of a cause of action for legal malpractice under certain circumstances. For example, when a client dies after filing a claim for legal malpractice, the claim passes to the client's estate. [Citation.] If a bankruptcy estate owns a bankrupt person's claim for legal malpractice, then that estate has the power to assign that claim to the bankrupt person, giving that person the right to pursue the cause of action. [Citation.]" (*Id.* at p. 1079.) The court then observed that while "[c]ourts in other jurisdictions acknowledge the strong policy reasons for disallowing assignment of legal malpractice claims in most cases," "[n]onetheless, several jurisdictions have carved out exceptions to the general rule prohibiting assignment of malpractice claims." (*Ibid.*) After discussing *Cerberus* and *Richter*, the *Learning Curve* court concluded as follows: "Illinois courts have not addressed assignment of a legal malpractice claim as part of a transfer of assets in a merger. Here, as in *Richter* and *Cerberus* . . . , the assignment formed a minor part of a transaction that encompassed a panoply of other rights and obligations. Learning Curve did not assign the claim to an unrelated third party; instead, Learning Curve assigned part of the claim to the persons who actually suffered the loss due to the alleged malpractice. We find that public policy does not prohibit the assignment of the malpractice claim under these specific circumstances. Hence, the rule barring the assignment of Learning Curve's claim is not applicable; therefore, the defendants were not entitled to judgment as a matter of law." (*Learning Curve*, at pp. 1080, 1081-1082.)

20

# D

## *St. Luke's*

The most recent case in the line from *Richter* to *Cerberus* to *Learning Curve* is *St. Luke's Magic Valley Reg'l Med. Ctr. v. Luciani* (Id. 2013) 293 P.3d 661 (*St. Luke's*). In *St. Luke's*, the defendant attorneys had represented Magic Valley Regional Medical Center (Magic Valley) in defending against a lawsuit brought by former hospital employees (the Suter litigation). (*Id.* at p. 662.) After Magic Valley replaced the defendants with another law firm, Twin Falls County, which owned Magic Valley, transferred Magic Valley's assets and liabilities to St. Luke's. (*Id.* at p. 663.) After that transaction, Magic Valley no longer existed. (*Ibid.*)

Following the transaction, St. Luke's carried the burden of the Suter litigation and ultimately settled for $4.25 million after expending approximately $12 million in legal costs. (*St. Luke's*, *supra*, 293 P.3d at p. 663.) Thereafter, St. Luke's sued the defendant attorneys for legal malpractice in federal court. (*Ibid.*) The attorneys moved for summary judgment on the ground that the purported assignment of the malpractice claim was invalid in Idaho as a matter of law. (*Ibid.*) The district court certified the question of the assignment's validity to the Idaho Supreme Court. (*Ibid.*)

On review of that question, the court concluded that "[b]ecause allowing assignment in the specific context of this case is consistent with Idaho law, comports with the holding of courts that have considered this particular issue, and implicates none of the policy rationales for a general bar on malpractice claim assignments, we hold that where a legal malpractice claim is transferred to an assignee in a commercial transaction, along with other business assets and liabilities, such a claim is assignable." (*St. Luke's*, *supra*, 293 P.3d at p. 665.) In explaining that conclusion, the court noted that while causes of action are generally assignable under Idaho law, "most courts find an exception for legal malpractice claims." (*Ibid.*) The court pointed to *Goodley* as identifying the "policy

21

grounds for barring legal malpractice claim assignment." (*St. Luke's*, at p. 665.) The court then explained as follows:

"Based largely on these public policy considerations, assignment of legal malpractice claims has been prohibited in the majority of jurisdictions that have considered the issue. [Citations.]

"Despite this majority rule, courts considering the precise transaction here--a commercial transfer of a legal malpractice claim, along with other assets and liabilities, to a successor in interest--have allowed assignment." (*St. Luke's*, *supra*, 293 P.3d at p. 666.)

The court then discussed *Cerberus* at length and also cited *Richter* and *Learning Curve*.[1] (*St. Luke's*, *supra*, 293 P.3d at pp. 666-667.) Following this, the court wrote as follows:

"Allowing an assignment in the specific context of this case would not implicate the policy concerns identified in *Goodley*. [Citation.] Magic Valley's malpractice claim was not assigned to a third party who 'never had any prior connection with the assignor or his rights.' [Citation.] Rather than being some third-party stranger to Magic Valley,

---

[1]     Another case commonly cited on this subject -- and also cited at this point by the court in *St. Luke's* -- is *Hedlund Mfg. Co. v. Weiser* (Pa. 1988) 539 A.2d 357. While *Hedlund* is somewhat analogous factually, in that it involved the assignment of a cause of action for the mishandling of a patent application shortly following the assignments of all rights in and to the patent application itself (*id.* at p. 358), the *Hedlund* opinion is not particularly persuasive because the court justified its decision to reject any public policy limitation on the assignment of the malpractice claim based on nothing more than this brief passage: "We will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected." (*Id.* at p. 359.) Obviously this rationale would apply to *any* assignment of a legal malpractice claim, and not just to the assignment of such a claim as part of a larger commercial transaction. Thus, *Hedlund* does not actually fit very well in the *Richter-Cerberus-Learning Curve-St. Luke's* line of cases.

St. Luke's was closely involved in the Suter litigation, assumed its defense, litigated it, and settled it--long after Magic Valley ceased to exist.  And, St. Luke's acquisition of the claim was not an isolated purchase made in a 'marketplace for legal malpractice claims'-- it was one component of a sale that transferred the bulk of Magic Valley's assets and liabilities, its medical center operation, and even its management team, to St. Luke's. Thus, far from being an arms-length bidder, St. Luke's was intimately connected to the litigation leading to the claim, and did little to restructure the hospital after acquiring it, beyond changing its name.  It thus makes sense to treat St. Luke's as Magic Valley's successor, and not a stranger, when assessing the propriety of the assignment. Logically, given that St. Luke's assumed the obligations under the Suter litigation, it certainly should have the rights attendant to that assumption--which would include the right to recoup any malpractice losses that impacted the value of the consideration it received under the Agreement.

"Luciani provides no compelling reason why allowing assignment in this case would undermine the attorney-client relationship, or increase litigation.  The cases he proffers concern assignments to strangers, or former adversaries in litigation, as opposed to successors.  And, there is no reason to think that allowing assignment here would impact negatively on the public's perception of the legal profession, or 'debase the legal profession.'  [Citation.]  Indeed, just the opposite seems more likely--that *prohibiting* such assignments would diminish the public's perception of attorneys. Magic Valley no longer exists to enforce this malpractice claim and, without a valid assignment, neither could any other entity enforce it.  St. Luke's points out that the mere 'fortuity' of this change in corporate ownership would mean that Luciani could 'entirely escape liability' for any alleged malpractice.  And in an era of ever-increasing corporate restructuring, it is hard to imagine that this Court, bestowing such a lucky break to attorneys, while leaving clients without recourse, would lead to any public perception except favoritism.  In other words, forbidding assignment here would likely lead to the 'very real concern' . . . that a

23

'decision of this Court will reinforce the perception, shared by many in our society, that courts will go out of their way in order to protect members of the bar.' [Citation.] We, therefore, find that there are no public policy concerns disfavoring the assignment of a legal malpractice claim in the context of this case." (*St. Luke's*, *supra*, 293 P.3d at pp. 667-668, fn. omitted.)

IV

*Resolution*

We find the out-of-state cases set forth above to be persuasive authority. Although the general rule in California bars the assignment of a cause of action for legal malpractice, a narrow exception is appropriate on the particular facts here.

In this case, the assignment of the legal malpractice claim was only a small, incidental part of a larger commercial transfer between insurance companies involving the transfer of assets, rights, obligations, and liabilities. The transfer did not treat the legal malpractice claim as a distinct commodity and did not create a market for such claims. Thus, the situation is *not* analogous to the assignment of a bare cause of action for fraud -- unlike the situation in *Goodley*. (See *Goodley*, *supra*, 62 Cal.App.3d at p. 398.) White Mountains did not simply buy a malpractice claim, like buying a fraud claim without buying the money or property obtained by the fraud. Instead, White Mountains -- through a series of transactions -- acquired Modern Service's entire book of insurance business in California. One small part of that acquisition was the Cuison policy, and attendant to the acquisition of that policy was the acquisition of any right Modern Service had to sue Borton for legal malpractice for the services Borton had provided to Modern Service and its insured, Cuison. Unlike the cause of action arising out of the alleged malpractice in the dissolution proceeding at issue in *Goodley*, there is nothing about the transaction here that can be analogized to "a naked right of action for fraud and deceit as a marketable commodity." (*Ibid*.)

24

In addition, White Mountains was not a former adversary of Modern Service. And it succeeded to all of Modern Service's rights *and obligations* related to the Cuison policy. Thus, White Mountains became the insurer in the tripartite relationship with Cuison and Borton. As such, White Mountains was liable to the same extent that Modern Service would have been had the series of transactions never occurred. In fact, it was White Mountains that ultimately suffered the bulk of the financial consequences of the failure to accept Johnson's statutory offer to compromise back at the outset of the Johnson litigation. Just as in *St. Luke's*, given that White Mountains assumed the obligations under the Johnson litigation, it certainly should have the rights attendant to that assumption, which would include the right to recoup any corresponding losses due to Borton's malpractice (if any).

Another significant fact is that in this case, the legal malpractice claim arose after Modern Service retained Borton to represent and defend Cuison, and the communications between Borton and Modern Service were conducted via a third party claims administrator. These circumstances are not like those in the other cases that involved a more personal attorney-client relationship.

Borton offers various reasons why we should find the out-of-state cases discussed above distinguishable, not controlling, and irrelevant. We find that Borton's arguments ring hollow because Borton fails to tackle head-on the most salient point of those cases -- the analysis of why the public policy reasons for barring assignment of legal malpractice actions first identified in *Goodley* simply *do not hold* when the assignment occurs under circumstances like those in this case. Borton's catalogue of factual distinctions is of no weight in light of the persuasive *reasoning* offered in *Richter*, *Cerberus*, *Learning Curve*, and *St. Luke's* as applied to the circumstances here.

Borton contends that if we are "going to consider the case law of other jurisdictions for guidance," we should look to *General Sec. Ins. Co. v. Jordan, Coyne & Savits* (E.D. Va. 2005) 357 F.Supp.2d 951, in which the district court decided that the

25

Supreme Court of Virginia had "adopted a bright-line rule against the assignment of legal malpractice claims." (*Id.* at p. 961.) *General Security* is not particularly helpful, however, because the court there did not purport to examine the various public policy concerns underlying the rule against the assignment of legal malpractice claims to determine whether those concerns were implicated by the facts of the case before it. Instead, the district court simply followed what it believed to be the bright-line rule of law established by the state's highest court.

Even looking to the underlying decision by the Virginia Supreme Court -- *MNC Credit Corp. v. Sickels* (Va. 1998) 497 S.E.2d 331 -- we find nothing in that decision that undercuts the persuasive reasoning offered in *Richter*, *Cerberus*, *Learning Curve*, and *St. Luke's*. In *Sickels*, the court took note of the public policy reasons identified in *Goodley* for banning the assignment of legal malpractice claims but made no attempt to determine whether those reasons applied to the case before it. (*Id.* at pp. 333-334.) In fact, it is not even clear from the opinion in *Sickels* how the malpractice claim related to the "Asset Purchase Agreement" that the court mentioned as the means by which the original client, Maryland National, "assigned all its rights, interests, and obligations in connection with a loan to MNC Credit Corporation," the party that tried to sue Maryland National's former attorney. (*Id.* at pp. 332-333.) And though *Richter* had been decided already by the time of the *Sickels* decision, the Virginia Supreme Court did not mention, let alone try to distinguish, that case. Given all of these circumstances, nothing in *Sickels* persuades us to follow the general rule in this case.

For the foregoing reasons, we conclude that on the stipulated facts presented here, Modern Service's cause of action for legal malpractice against Borton *was* assignable. Accordingly, White Mountains has standing to pursue that cause of action, and the trial court erred in concluding otherwise.

DISPOSITION

The judgment is reversed.  White Mountains shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)



                                       ROBIE          , J.



We concur:



       HULL          , Acting P. J.



       MAURO        , J.