Lau v. Constable, 2022 NCBC 34.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

GREGORY LAU and VENT TECH
CORPORATION,

Plaintiffs,

v.

DOUGLAS CONSTABLE; ROBERT
MARTIN; TIFFANY WILLARD; and
JENNIFER CONSTABLE,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 4393

**ORDER AND OPINION ON
DEFENDANT ROBERT MARTIN'S
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION**

1.     THIS MATTER is before the Court on Defendant Robert Martin's

("Defendant" or "Martin") Motion to Dismiss for Lack of Subject Matter Jurisdiction

(the "Motion" or "Motion to Dismiss") pursuant to North Carolina Rule of Civil

Procedure ("Rule(s)") 12(b)(1). (ECF No. 206.)  For the reasons stated below, the

Motion is GRANTED in part and DENIED in part.

*Terpening Law PLLC, by William R. Terpening and Shaefer A. Shepard,
for Plaintiff Vent Tech Corporation.*

*Blanco Tackabery & Matamoros, P.A., by Chad A. Archer, Peter J.
Juran, and Elliot A. Fus, for Defendant Robert Martin.*

Earp, Judge.

## I.     INTRODUCTION

2.     The gravamen of the Amended Complaint in this case is that, for years,

funds were embezzled from Plaintiff Vent Tech Corporation ("Vent Tech" or the

"Company") with the knowledge and participation of Martin, formerly the Company's

President.  On 31 December 2012, the majority of the Company's assets were sold to

VL Acquisition, LLC (the "Purchaser") pursuant to the terms of an Asset Purchase Agreement ("APA"). The issue before the Court with respect to the current Motion is whether the Company sold its right to pursue its claims against Martin in this transaction such that it no longer has standing to pursue those claims and, therefore, this Court lacks subject matter jurisdiction over them. For the reasons stated below, the Court determines that some, but not all, of Vent Tech's claims must be dismissed because the Company no longer has standing to bring them.

## II. FACTUAL BACKGROUND

3. "When reviewing a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a trial court may consider and weigh matters outside the pleadings." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (quoting *DOT v. Blue*, 147 N.C. App. 596, 603 (2001). And, when the Court considers the pleadings, it must "view the allegations [of the complaint] as true and the supporting record in the light most favorable to the non-moving party." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644 (2008). Accordingly, the following facts are stated only for purposes of deciding the present Motion.

4. Vent Tech is a closely-held entity organized under the laws of North Carolina. (Am. Compl. [hereinafter "Compl."] ¶ 8, ECF No. 110.) It was established to design, manufacture, and sell medical devices, many of which were produced in China and shipped to the Company's North Carolina plant for assembly. (Compl. ¶ 15.) Former Plaintiff Gregory Lau ("Lau") has been the majority shareholder of the Company at all relevant times. (Compl. ¶ 7.)

5. Martin is a resident of North Carolina. He has an extensive business background, served as the Company's President at all relevant times, and was a minority shareholder in the Company prior to October 2009. (Compl. ¶ 10.) He remained on the Company's payroll until the asset sale in December 2012, at which time he accepted a position with the Purchaser. (Compl. ¶ 22; Martin Aff. ¶ 39, ECF No. 161.)

6. As President, Martin had ultimate responsibility for all aspects of the Company's business, including accounting and record-keeping, as well as for overseeing the Company's other executives and employees. (Compl. ¶ 25.) Vent Tech alleges that in reality, however, Martin exercised very little oversight over the affairs of the Company, which allowed it to be "pillaged" by the Company's former Chief Financial Officer and minority shareholder, Douglas Constable ("Constable"). (Compl. ¶ 26.)

7. In addition to Lau's physical distance from the Company's United States operations, Lau does not have the same level of expertise in the industry or in financial accounting that Martin possesses. (Compl. ¶ 29.) Martin represented to Lau, who resides in China, that he would manage United States operations so that Lau could focus his attention on overseas production. (Compl. ¶ 27.)

8. As a result of Martin's control over the operations of the Company, Lau's own lack of expertise, and Martin's alleged representations to Lau, Lau was unaware that money was being stolen from the Company. (Compl. ¶¶ 27, 29–30.)

9. On or around 31 December 2012, most of the Company's assets were sold to the Purchaser, a Michigan limited liability company. (Compl. ¶ 32.) Following the sale, Lau was the sole remaining shareholder of the Company. (Compl. ¶ 33.)

10. The APA executed by both the Company and the Purchaser contains a choice of law provision. It states that the APA "shall be governed by and construed in accordance with the laws of the State of Michigan, without giving effect to any choice or conflict of law provision or rule under the State of Michigan or any other jurisdiction that would cause the application of the laws of any jurisdiction other than the State of Michigan." (APA, at § 12.9, ECF No. 208.1.)

11. Pursuant to the APA, "the Buyer agree[d] to purchase from the Seller and the Seller agree[d] to sell, transfer, convey and deliver to the Buyer, all the assets, properties and rights of the Seller used or useful in the Business as of the Closing (as defined in Section 2.2 hereof), of whatever kind or nature . . ., other than the items set forth on Schedule 1.1 hereto (the 'Excluded Assets')." (APA, at § 1.1 (emphasis in original).) Section 1.1(k) of the APA includes, in the list of assets purchased, "claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind[.]" (APA, at § 1.1(k).)

12. Schedule 1.1 enumerates the Excluded Assets as follows:

1. GMC Delivery Van (Ventlab Health Services)
2. All real estate and permanent fixtures thereto in China
3. Honda Odyssey van
4. All equipment used exclusively in Sellers' Discovery Chemscience business
5. Laptop Computers . . .
6. *All Amounts Due from employees, amounting to approximately $ 81,000 and subject to change prior to closing.*

7. All Investments in Discovery Chemscience

(APA, at Sch. 1.1, ECF No. 208.2 (emphasis added).)

13. Section 3.25(w) of the APA provides: "Except as set forth in Schedule 3.25, no Employee owes any sum to the Seller." (APA, at §3.25(w) (emphasis in original).)

14. Schedule 3.25w, titled "Employee Loans," further describes the Excluded Assets:

> There are a number of employees who owe various amounts to Seller. Those receivables do not convey to Buyer as a part of this transaction in any way, (sic) and are listed as Excluded Assts on Schedule 1.1.

(APA, at Sch. 3.25w, ECF No. 208.3.)

15. After the sale, on or about 10 May 2013, the Purchaser, believing that there were financial irregularities in the Company's books, advised Lau of its concern that Constable was responsible. (Compl. ¶ 35.) As a result, Lau conducted an investigation and discovered significant misuse of Company funds occurring over a period of years. (Compl. ¶ 36.)

16. In fact, Vent Tech alleges that it was Constable's misuse of Company funds and misrepresentations that led to the sale of the Company to Purchaser in 2012. For instance, in or around 2011, Constable told Lau that the Company was struggling to make ends meet and requested that Lau both take a salary reduction and contribute personal funds to finance the Company's operations. Meanwhile, Constable and Martin increased their salaries, and Constable allegedly falsified the

Company's books and records for at least the period of 2008 through 2012 to conceal his fraud and theft. (Compl. ¶¶68–80.)

17. Vent Tech alleges that Martin, the Company's President, was "either aware of or complicit in the scheme, turned a blind eye toward the scheme, or, through his own complete lack of oversight, failed to detect the scheme." (Compl. ¶ 67.)

18. Ultimately, because of this misconduct, the Company was sold at a significantly lower price than it would have been had the Company's records not been manipulated. (Compl. ¶ 83.)

19. Even after the sale of its assets in 2012, and at a time when the Company was no longer conducting operations, Constable allegedly continued to use a Company credit card for personal benefit. (Compl. ¶¶ 86–87.) Vent Tech alleges that Martin also continued to use a Company credit card for personal benefit through 2013 without authorization. (Compl. ¶¶ 96–98.)

20. As a result of these alleged wrongs to the Company, Vent Tech asserts several economic fraud-based claims against Martin.

### III. PROCEDURAL BACKGROUND

21. This case was designated as a mandatory complex business case by order of the Chief Justice of the North Carolina Supreme Court on 22 July 2016, (ECF No. 4), and assigned to the Honorable Michael L. Robinson the same day, (ECF No. 5). It was reassigned to the Honorable Gregory P. McGuire on 17 January 2018, (ECF No. 108), and then to the undersigned on 6 May 2021, (ECF No. 190).

22. This matter has an extensive procedural history. Plaintiffs filed their Complaint on 21 July 2016, (ECF No. 1), and amended their Complaint on 25 January 2018, (ECF No. 110).

23. On 7 February 2017, the Court issued its Order and Opinion on Motions to Dismiss, (ECF No. 44), and on 24 September 2019 it issued its Order and Opinion on Cross Motions for Summary Judgment, (ECF No. 178). As a result of these Orders and Opinions and other relevant filings in this case, several parties and claims have been dismissed. The remaining Plaintiff is Vent Tech, which asserts claims against the remaining Defendant, Martin, for constructive fraud, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and civil conspiracy.[1]

24. The Court issued its Notice of Jury Trial on 3 December 2021, setting the remaining claims for trial to commence on 7 February 2022. (ECF No. 199.)

25. Martin filed the current Motion on 10 January 2022, asserting for the first time in this litigation that the Court lacks subject matter jurisdiction to rule on the Company's remaining claims against him because the Company is not the real party in interest—having sold its right to pursue these claims to the Purchaser on 31 December 2012. (ECF No. 206.) In light of the Motion's filing on the eve of trial, Vent Tech moved to continue the trial setting. (ECF No. 212.)

26. The Court granted Vent Tech's Motion to Continue Trial on 18 January 2022. (ECF No. 217.) By separate Order, the Court permitted the parties to conduct

---

[1] Vent Tech's claims for conversion, unjust enrichment, constructive trust, and civil conspiracy are limited to alleged conduct occurring on or after 29 December 2012. *See Lau v. Constable*, 2019 NCBC LEXIS 71, at *36 (N.C. Super. Ct. Sept. 24, 2019) (detailing the surviving aspects of the Company's claims against Martin).

additional discovery on the standing issue and to submit supplemental briefing limited strictly to the issues raised by the Motion. (ECF No. 220.) The Court reset the trial to commence on 10 October 2022. (ECF No. 223.)

27. The Motion has now been fully briefed, and the Court heard oral argument from both parties at a hearing held on 6 July 2022. (ECF No. 233.) The Motion is ripe for determination.

## IV. LEGAL STANDARD

28. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[,]" *In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 12 (citation omitted), and "must be addressed, and found to exist, before the merits of the case are judicially resolved[,]" *In re T.B.*, 200 N.C. App. 739, 742 (2009) (cleaned up). "If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express Inc.*, 168 N.C. App. 175, 177 (2005). Standing requires that every action be brought by the real party in interest. *Morton v. Thornton,* 259 N.C. 697, 699 (1963) (holding that an assignee is a real party in interest with respect to the right assigned).

29. "Standing concerns the trial court's subject matter jurisdiction and is therefore properly challenged by a Rule 12(b)(1) motion to dismiss." *Fuller v. Easley,* 145 N.C. App. 391, 395 (2001); *see also Aubin v. Susi,* 149 N.C. App. 320, 324 (2002) ("Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction."). "Rule 12(b)(1) requires the dismissal of any action 'based upon a trial court's lack of jurisdiction over the subject matter of the claim.'" *Watson v. Joyner-*

*Watson*, 263 N.C. App. 393, 394 (2018) (quoting N.C. R. Civ. P. 12(b)(1)). "If a court finds at any stage of the proceedings that it is without jurisdiction over the subject matter of a proceeding or case, it cannot enter a judgment in favor of either party; it can only dismiss the proceeding or case for want of jurisdiction." *Richards v. Nationwide Homes*, 263 N.C. 295, 303 (1965).

30. The plaintiff bears the burden of establishing subject matter jurisdiction. *See Universal Cab Co. v. City of Charlotte*, 2015 NCBC LEXIS 23, at *16 (N.C. Super. Ct. Mar. 5, 2015) ("As the party invoking jurisdiction, plaintiff[ ] ha[s] the burden of establishing standing by show[ing] facts that if accepted as true would demonstrate the existence of jurisdiction." (alterations in original) (citations and internal quotation marks omitted)); *Harper v. City of Asheville*, 160 N.C. App. 209, 217 (2003).

## V.     ANALYSIS

31. Martin argues that Vent Tech lacks standing to assert its claims because the language of the APA establishes that the Company assigned those claims to the Purchaser on 31 December 2012. Vent Tech responds (i) that the claims are unassignable, and (ii) that even if they could have been assigned, the contract is either clear that they were not assigned, or ambiguous as to whether they actually were assigned. The Court addresses each argument in turn.

A.    Choice of Law

32.    Given the choice-of-law provision in the APA, (APA, at § 12.9), the Court must first determine whether Michigan law governs interpretation of the APA, including its provision regarding the transfer of claims.

33.    North Carolina courts will enforce a choice of law provision unless "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or "(b) application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties." *Cable Tel Servs. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43 (2002).

34.    Vent Tech argues that Michigan has no substantial relationship to the parties or the transaction because neither it nor Martin has any ties to Michigan and the contract was not executed in Michigan.  Martin counters that the test is whether the parties *to the APA* have ties to Michigan and points to the fact that the Purchaser is a Michigan company.

35.    The Court agrees with Defendant.  There is an obvious and reasonable basis for the contract to be governed by Michigan law.  The Purchaser is a Michigan limited liability company.   As the acquiring entity, it is reasonable to think that the Purchaser would contract to protect its interests.  *See Torres v. McClain*, 140 N.C. App. 238, 241 (2000).  Therefore, unlike cases in which the parties to a contract

"ha[ve] never engaged in business of any kind" in the chosen state, "[are] not licensed or registered to conduct business in the [s]tate[,]" and "ha[ve] never knowingly entered into any contracts with any person or entity" in that state, *Cable Tel Servs.*, 154 N.C. App. at 643–44, the Purchaser here clearly had ties, both legal and physical, to Michigan. Accordingly, the choice of Michigan law to govern the transaction is reasonable. *Cf. Bundy v. Com. Credit Co.*, 200 N.C. 511, 516 (1931) (refusing to apply parties' choice of Delaware law because the "record [did] not disclose that any transaction took place in Delaware or that the parties even contemplated either the making or the performance of the contract in said State").

36. Vent Tech next argues that because an assignment of the claims asserted against Martin would be contrary to North Carolina's public policy against champerty, the choice of Michigan law to circumvent this outcome should not be enforced. Defendant responds that he does not believe North Carolina public policy concerns would prohibit the assignment of the claims here given their type (economic torts involving damage to a corporation's property) and the context in which they were transferred (as part of a larger asset sale in a commercial transaction involving sophisticated parties).

37. The Restatement of Conflict of Laws explains that "[t]he chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties." Restatement (Second) of Conflict of Laws § 187 cmt. g (1971). When deciding whether to enforce the choice of law provision, a court

must "apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule and whether the other state has a materially greater interest than the state of the chosen law in the determination of the particular issue." *Id.* However, "[t]he forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law." *Id.*

38.     Here, the public policy at issue is North Carolina's prohibition of champerty. " '[C]hamperty' is a species of maintenance whereby a stranger makes a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." *Smith v. Hartsell*, 150 N.C. 71, 76 (1908) (internal quotation marks and citation omitted). The public policy prohibiting champerty, as it has developed in the common law, is aimed at preventing "clearly officious" interference made "for the purpose of stirring up strife and continuing litigation." *Oliver v. Bynum*, 163 N.C. App. 166, 170 (2004).

39.     But the law striking down attempted assignments that violate this public policy has not, to this Court's knowledge, been applied under the circumstances present here. Instead, where assignments have been held to be void as violative of North Carolina's public policy, the facts have involved the attempted assignments of claims arising from personal injury, typically in the form of bad faith claims against insurers for allegedly mishandling the personal injury claims of their insureds. *See, e.g., Horton v. New S. Ins. Co.*, 122 N.C. App. 265, 268 (1996) ("[A]ssignments of

personal tort claims are void as against public policy because they promote champerty."); *Terrell v. Lawyers Mut. Liab. Ins. Co.*, 131 N.C. App 655, 660 (1998) (the "allegations of bad faith" make the claim unassignable); *Charlotte-Mecklenburg Hosp. Auth. v. First of Georgia Ins. Co.*, 340 N.C. 88, 91 (1995) ("The assignment of a [personal injury] claim gives the assignee control of the claim and promotes champerty."). These decisions appear to focus on both the personal nature of the injury and the lack of a relationship (other than as a result of the claim assigned) between the assignee of the claim and the alleged wrongdoer. The fundamental proposition is that a third-party stranger to the tort should not be permitted to capitalize on the personal injury suffered by the victim.

40. Vent Tech, relying on *Horton,* a case involving an insured's relationship with his insurer, contends that North Carolina courts have broadly held that breach of fiduciary duty claims can never been assigned. However, the rationale applied in that cases is not applicable here. The claims in *Horton* resulted from the defendant insurer's bad faith refusal to settle personal injury claims brought against Horton, its insured, by the driver of a car who was involved in an accident. *Horton,* 122 N.C. App. at 268. Given the facts, including the "special relationship of trust and confidence" between the insured and the insurer, the Court of Appeals held that "[t]he claim for breach of fiduciary duty is . . . personal[.]" *Id.* at 269.

41. In contrast, the claims here result from economic harms Martin allegedly inflicted on the Company, not from personal injuries suffered by an individual. Vent Tech alleges that Martin misappropriated money himself, allowed

Constable to do so, or both. The harm is to the Company's property, and no personal injury is at issue. Thus, while the claims sound mostly in tort, they are distinguishable from the claims in *Horton*, *Terrell*, and *Charlotte-Mecklenburg Hosp. Authority* in that they involve alleged economic loss to a corporation and not physical injury to a person.

42. Moreover, the transfer of claims to the Purchaser here was made as part of a larger asset purchase between two commercial entities. Courts in other jurisdictions that adhere to the public policy prohibiting champerty have recognized an exception for claims that transfer as part of a larger transaction. *Cf. White Mountains Reinsurance Co. of America v. Borton Petrini, LLP,* 221 Cal. App. 4th 890, 909 (2013) (holding that even highly personal tort of legal malpractice may be assignable in the broader context of a sale of corporate assets); *Cerberus Partners, L.P. v. Gadsby & Hannah*, 728 A.2d 1057, 1060 (1999) (holding that a claim for malpractice is assignable when part of a "general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations"); *St. Luke's Magic Valley Reg'l Med. Ctr. v. Luciani (In re Order Certifying Question to Idaho Supreme Court),* 154 Idaho 37, 44 (2013) (holding that although legal malpractice claim are not generally assignable, "where the . . . claim is transferred to an assignee in a commercial transaction, along with other business assets and liabilities, such a claim is assignable").

43. Finally, factually, this is simply not a case in which a third-party has acquired a specific claim in order to pursue it for profit. Indeed, the Purchaser here

did not pursue the claims at issue at all and has not profited from this aspect of its purchase.

44.     "The courts of North Carolina have been reluctant to find that the law of another state violates our public policy absent a showing that the law violates 'some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state.' " *Torres*, 140 N.C. App. at 243 (citing *Boudreau v. Baughman*, 322 N.C. 331, 342 (1988)).  As our Supreme Court has stated:

> It is true we have held that foreign law or rights based thereon will not be given effect or enforced if opposed to the settled public policy of the forum.  However, the mere fact that the law of the forum differs from that of the other jurisdiction does not mean that the foreign statute is contrary to the public policy of the forum.  To render foreign law unenforceable as contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state.  This public policy exception has generally been applied in cases such as those involving prohibited marriages, wagers, lotteries, racing, gaming, and the sale of liquor.

*Boudreau*, 322 N.C. at 341–42 (citations omitted); *see also Howard v. Howard*, 200 N.C. 574, 579 (1931) ("To justify a court in refusing to enforce a right of action which accrued under the law of another State, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other such reason the enforcement of it would be prejudicial to the general interests of our own citizens." (citation omitted)).

45.     On the facts of this case, the public policy in North Carolina does not compel the Court to ignore the bargained-for choice of law provision in the APA.  To

the contrary, the public policy and established law of this State promotes the freedom to contract and the enforceability of contracts as they are written. *See, e.g.*, *Alford v. Textile Ins. Co.*, 248 N.C. 224, 227 (1958) ("Parties are entitled to contract according to their free will. . . . The freedom of the right to contract has been universally considered as guaranteed to every citizen." (citation omitted)). To be sure, choice of law provisions have been enforced in asset purchase agreements. *See, e.g.*, *N. Star Mgmt. of Am., LLC v. Sedlacek*, 235 N.C. App. 588, 592 (2014). Accordingly, the Court determines that North Carolina's public policy against champerty does not apply to the facts here, and under these circumstances it does not outweigh the State's public policy in favor of honoring the contracting parties' choice of Michigan law. *Accord Accrued Fin. Servs. v. Prime Retail, Inc.*, 298 F.3d 291, 303 (4th Cir. 2002) (finding that "no strong public policy against the California law allowing the assignments in this case can be gleaned from whatever, if anything, might remain of the common law doctrine[ ] of . . . champerty . . . in Maryland").

46. The Court therefore concludes that Michigan law applies to determine whether Vent Tech's claims against Martin were transferred to the Purchaser as a result of the asset sale.

B. <u>Assignability of the Claims</u>

47. The parties next dispute whether the claims were assigned at the time of the sale on 31 December 2012 when the Company had not yet become aware of Martin's alleged wrongdoing.

48.     Under Michigan law, a fraud claim, as well as a breach of fiduciary duty claim sounding in fraud, exists when the misconduct occurs, regardless of when the damage is discovered.  MCL § 600.5827 (except as otherwise provided by law, "the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results"); *Thomas v. Richards*, No. 354255, 2021 Mich. App. LEXIS 4632, at \*6 (Mich. Ct. App. July 29, 2021) (a "fraud claim accrued at the time the wrong upon which the claim is based was done regardless of the time when damage results" (internal quotation marks omitted) (citing MCL § 600.5827)).

49.     Moreover, the fact that Vent Tech was not aware of its claim when it transferred its assets is not determinative.  Parties routinely contract to release claims of which they are unaware.  *See, e.g.*, *Clauss v. State Farm Mut. Auto. Ins. Co.*, No. 350181, 2020 Mich. App. LEXIS 5494, at \*3 (Mich. Ct. App. Aug. 20, 2020) (finding that release saying that it discharged defendant "from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and/or compensation in any way related to the May 9, 1990 accident" was unambiguous and applied to fraud claim discovered later); *Dresde v. Detroit Macomb Hosp. Corp.*, 218 Mich. App. 292, 297–98 (1996) (explaining that a release that stated "any and all" causes of action sufficed to bar the plaintiff's fraud claim); *Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp.*, 284 Mich. App. 617, 642 (2009) (holding that the broad language used in a settlement sufficed to release all claims because "[t]here cannot be any broader classification than the word 'all[,]' " which "leaves no room for

exceptions").[2] The Court has not been presented with sufficient reason why the same rationale should not also apply to the transfer of "claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind" by way of sale. Accordingly, the Court concludes that the claims here were extant and capable of transfer on 31 December 2012.

50. The Court further concludes that the claims are assignable under Michigan law. *See Detroit v. Bridgeport Brass Co.*, 28 Mich. App. 54, 59 n.5 (1970) (stating that pursuant to MCLS § 600.2921, all claims survive death and that the statute "operates incidentally to remove the restriction on assignability"); *Detroit Greyhound Emps. Fed. Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 689 (Michigan courts "have striven to uphold freedom of assignability"); *see also Mason v. Vogue Knitting Corp.*, 365 Mich. 552, 560 (1962) (affirming trial court's denial of motion to dismiss in which corporation sought dismissal of fraud claim as unassignable)[3]; *Perkett v. Manistee & N.E.R. Co.*, 175 Mich. 253, 264 (1913) (claim for conversion may be assigned) (collecting cases); *Dime v. Griswold Bldg.*, No. 314752, 2010 Mich. App. LEXIS 2791, at *19–20 (Mich. Ct. App. July 29, 2014) (assignee was real party in interest because it was "vested with a right of action by assignment" and entitled to bring contract-based claims); *Grand Traverse Convention*

---

[2] The law in North Carolina is consistent on this point. *See, e.g.*, *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 394 (2004) ("Our courts have . . . long recognized that parties may release existing but unknown claims.").

[3] Michigan law treats constructive fraud as "actual fraud without the element of intent." *Talton v. BAC Home Loans Servicing LP*, 839 F. Supp. 2d. 896, 913 (E.D. Mich. 2012).

*& Visitor's Bureau v. Park Place Motor Inn, Inc.,* 176 Mich. App. 445, 448 (1989) ("Generally, all legitimate causes of action are assignable.").

51. Finally, the Court concludes that the claims were indeed assigned pursuant to the unambiguous language of the APA.

52. The "goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself*." Wyandotte Elec. Supply Co. v Elec. Tech. Sys., Inc.,* 499 Mich. 127, 143–44 (2016). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Phillips v. Homer (In re Egbert R. Smith Trust),* 480 Mich. 19, 24 (2008*); see also O'Connor v. March Automatic Irrigation Co.,* 242 Mich. 204, 210 (1928) ("Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it[.]" (citation omitted)).

53. Section 1.1 of the APA states in relevant part that the sale included "all the assets, properties and rights of the Seller used or useful in the Business as of the Closing . . ., of whatever kind or nature and wherever situated and located and whether reflected on the books and records or previously written-off or otherwise not shown on the Seller's books and records, other than the items set forth on Schedule 1.1 hereto (the 'Excluded Assets')." Section 1.1(k) specifically includes in the assets purchased "claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind[.]"

54. Conversely, the list of Excluded Assets in Schedule 1.1 does not reference legal rights of action. But Vent Tech nevertheless relies on number 6 on the list: "All Amounts Due from employees, amounting to approximately $ 81,000 and subject to change prior to closing." Vent Tech argues that this language encompasses the claims in this lawsuit and excepts them from the assets that were sold.

55. The Court does not agree. Principles of contract construction require that the contract be read as a whole and that all parts be given meaning. *See, e.g.*, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 50 n.11 (2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."). When the contract is read as a whole, the language leads to a single, unambiguous result.

56. First, it is clear from Section 1.1 of the APA that the assets sold include all of the Company's rights, regardless of whether they are shown on the Company's books. To ensure that the parties' intent to convey legal rights was included in the sale, they are specified in Section 1.1(k).

57. On the other hand, the specific asset excluded from this broad language is identified in Schedule 1.1 as "Amounts Due from employees, amounting to approximately $ 81,000 and subject to change prior to closing." This language indicates that the Company was aware of the amounts in question and that they were capable of being calculated prior to closing. Consistent with that reading is the fact that Schedule 1.1 is again referenced in Schedule 3.25w, titled "Employee Loans," which pertains to established employee obligations to the Company. Furthermore, Section 3.25(w) of the APA states that "Except as set forth in <u>Schedule 3.25</u>, no

Employee owes any sum to the Seller." When read together, this language cannot refer to potential damages from unknown claims. Indeed, at the time the sale occurred—and to this date—no determination has yet been made that Vent Tech's claims have resulted in any sums owed by Martin to Vent Tech. Thus, the Court concludes that the exception for Amounts Due from employees as stated in Schedule 1.1 does not encompass damages that might or might not be awarded with respect to the Company's claims.

58.     Vent Tech then changes course and argues that the language at issue is ambiguous and should be interpreted by a jury.[4] Specifically, the Company contends that the phrase "used or useful in the Business as of the Closing" modifies the assets that were sold. It contends that the alleged misconduct that led to its claims was in no way useful in the "Business," which is defined in the APA as "designing, manufacturing and providing products used in the health care industry, including for

---

[4] Defendant points to Section 12.10 of the APA, which states that the APA, along with its schedules, exhibits, and other transaction documents "constitute[s] the sole and entire agreement of the parties with respect to the subject matter [t]hereof." (APA, at § 12.10.) This integration clause, Martin contends, prevents the introduction of parol evidence and leaves interpretation of any ambiguity to the Court. *See, e.g.*, *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 502 (1998) (holding that, subject to limited exceptions relating to the formation of the clause itself, "when the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated"); *N. Warehousing, Inc. v. Dep't of Educ.*, SC: 130689, 2006 Mich. LEXIS 996, at *2 (Mich. May 24, 2006) ("The contract between the parties contains an integration clause. Reliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause."); *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 413–14 (2002) ("Because an integration clause nullifies all antecedent agreements, when the terms of a commitment and a subsequently enacted policy conflict and the policy contains an integration clause, the terms of the policy must control." (citations and internal quotation marks omitted)).

anesthesia, respiratory care, oxygen therapy, critical care and emergency medical services[.]" (APA, at 1.)

59.     Martin responds that the language is not ambiguous because the right to recover arising from the claims, like the Purchaser's right to collect accounts receivable and to pursue other claims arising from the Business, is "useful" and included within the sale. The Court agrees that any claims the Company might have to recover for economic harms done to it would certainly be useful to restore its coffers and thereby improve its ability to design, manufacture, and provide products used in the healthcare industry. Therefore, Court concludes that this language is not ambiguous.

60.     The Company next argues that the fact that the scheduled exception for Amounts Due by employees is limited to $81,000 creates an ambiguity when considered against the Company's allegation that it has suffered significant damages that are well in excess of that amount. As stated above, the Court also finds the language inconsistent with Vent Tech's reading, but not because it is ambiguous. Rather, the Court concludes that the language is clear but that the Company's strained interpretation of it is incorrect. The contract unambiguously transferred Vent Tech's claims upon closing, and the Court will not find an ambiguity where one does not exist. *See Mayor of Lansing v. Michigan Pub. Serv. Comm'n*, 470 Mich. 154, 165 (2004) (stating that an "ambiguity is a finding of last resort" and that "a finding of ambiguity is to be reached only after all other conventional means of interpretation have been applied and found wanting" (cleaned up) (citation omitted)), *overruled on*

*other grounds by Petersen v. Magna Corp.*, 484 Mich. 300, (2009); *Frankenmuth Mut. Ins. Co. v Masters*, 460 Mich. 105, 111 (1999) ("[W]e will not create ambiguity where the terms of the contract are clear."); *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 467 (2003) ("[C]ourts cannot simply ignore portions of a contract . . . in order to declare an ambiguity."); *see also Rory v Cont'l Ins. Co.*, 473 Mich. 457, 468 (2005) ("A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written.*").

61.    The Court therefore concludes that Vent Tech sold its then existing claims against Martin to the Purchaser when it closed on the sale of its assets to the Purchaser on 31 December 2012 as specified in the APA.  Consequently, Vent Tech lacks standing to pursue those claims here.

C.    Claims Based on Post-Sale Conduct

62.    Some of the claims at issue may have arisen from conduct that occurred after the sale on 31 December 2012.  Martin protests that Vent Tech's expert testimony establishes that he did not engage in post-sale misconduct.  But Vent Tech responds that it has evidence that Martin did engage in misconduct and that his "duties to [Vent Tech] persisted during and after the sale[.]" (Pl. Vent Tech Corporation's Resp. Br. 24, ECF No. 230.)

63.    Specifically, Vent Tech alleges that Martin continued to use his Vent Tech credit card even after the acquisition.  (Compl. ¶¶ 95–98.)  In its opposition to the Motion, the Company further contends that Martin breached his fiduciary duty

to the Company[5] by failing to supervise Constable's use of a Company credit card after 31 December 2012; that he breached his fiduciary duties to the Company in other ways during the transaction with the Purchaser; and that he improperly disbursed, and failed to repay the Company, proceeds resulting from the asset sale. To the extent Vent Tech adequately alleges claims that Martin engaged in wrongdoing against it after the sale, those claims were not transferred in the sale and, consequently, the sale does not impact Vent Tech's standing to pursue them.

## IV. CONCLUSION

V. WHEREFORE, for the reasons set forth above, the Court hereby GRANTS Martin's Motion to Dismiss in part, and Vent Tech's claims against Martin, to the extent they are based on conduct that occurred on or before the closing of the asset purchase on 31 December 2012, are DISMISSED without prejudice. In all other respects, the Motion is DENIED.

IT IS SO ORDERED, this the 11th day of July, 2022.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

[5] It is unclear to the Court at this point what, if any, fiduciary duty Martin may have owed Vent Tech after 31 December 2012.